In the Matter of the Will of Sarah M. Blakely.

*December 18, 1879 — February 3, 1880.*

Wills. Evidence *on question of testamentary capacity.*

1. In this case, this court, reversing a judgment of the circuit court, holds that the testatrix possessed testamentary capacity when the will was made; the questions being only as to the force of evidence.

2. The will was made April 7, 1876, and the incapacity alleged was dementia, accompanied by insane delusions. *Held*, that clear, sensible and perfectly coherent letters written by the testatrix during the year 1875, and as late as February, 1876, upon business and other matters, are entitled to considerable weight in determining the issue.

3. The other evidence in the case, though showing eccentricity, caprice, fretfulness, and a suspicious and irritable temper, *held* not sufficient to establish either a lack of mental capacity in the testatrix, or insane delusions which would prevent the use of her faculties in disposing by will of her property. *The Chafin Will Case*, 32 Wis., 557; *Holden v. Meadows*, 31 id., 284; and *Burnham v. Mitchell*, 34 id., 117 — followed and approved.

4. The weight to be given to the testimony of medical experts in such cases, somewhat considered.

APPEAL from the Circuit Court for *Winnebago* County.

The circuit court reversed an order of the county court of said county, admitting to probate the will of Sarah M. Blakely. From the judgment of the circuit court, this appeal was taken by *David Blakely*, contestant of the will.

*Charles E. Pike*, for the appellant.

For the respondent, there were briefs by *George W. Burnell*, and oral argument by *Mr. Burnell* and *Charles W. Felker*.

COLE, J. The sole question in this case relates to the testamentary capacity of Mrs. Blakely to make the will executed by her on the seventh of April, 1876. The validity of the will is contested by her surviving husband, *David Blakely*, heir-at-law. The county court admitted the will to probate; but on appeal the circuit court decided that the testatrix was incompetent, by reason of mental unsoundness and insanity, to make a valid will, and reversed the order. The circuit court found from the evidence that Mrs. Blakely had been of unsound mind and chronically insane for a long time prior to the making of the will; that such insanity was of the type known as dementia, accompanied by insane delusions; and that the provisions of the will were influenced by and were

the result of such insane delusions. Considerable testimony was produced on the trial, on the one side for the purpose of proving that the testatrix was of sound mind and memory when she made the will; and on the other side to show that she was not. This testimony was analyzed and discussed with much clearness and ability by counsel on both sides, on the argument. Owing to the pressure of other duties we shall be compelled to deal with the questions of fact in a summary way, doing little more than stating the conclusions we have reached upon the evidence. In our deliberations, however, we have endeavored to give due consideration to all the evidence bearing upon the question of the testamentary capacity of Mrs. Blakely prior to and at the time she made her will, and also to the remarks of learned counsel upon the testimony.

We may say at the outset, that it appears the testatrix was formerly the wife of one Mr. Pratt, a farmer, and resided in Corning, New York. In the latter part of the year 1869, she, then being a widow without children, married the contestant, a widower having several children and residing in the township of Neenah, in this state. Of her early history or former married life we know but little. One of her brothers, who was a witness for the proponent of the will, testified that when she was a school girl she used to laugh and cry easily; and this peculiarity in her character seems to have increased as she grew older. In the latter part of her life, she became large and gross. In the summer of 1873, she was ill from a protracted fever. After her recovery, she visited her relatives in Iowa, and returned to her husband's home in October. Some time previous to this visit, she had a large rupture — " *umbilical hernia*," as her physician, Dr. Barnett, says, who was called to treat her in the summer of 1874; and from this rupture she suffered at times severely. She was obliged to wear a truss, or supporter, which it was extremely difficult to keep in position on account of her weight. She had a stroke of

apoplexy — or paralysis, as it is indifferently called in the testimony — about the 10th of December, 1875, which shock produced a depressing effect upon her spirits, causing frequent paroxysms of grief and crying, also affecting her speech, and making her lame in one side.   Dr. Barnett attended her upon this occasion, making several professional visits, and, according to his recollection, though of this he was not positive, there were decided symptoms of improvement between his first and last visit.   In April following, she made the will which is now contested.

The various provisions were dictated by herself to the magistrate who wrote it.   She was not ill at the time, but could walk about the house, though lame.   She talked with difficulty, but could generally make herself understood.   Soon after making her will, she went to Iowa again to visit her relatives, where she had another paralytic stroke.   She returned home about the 11th of September.   On the 26th of that month, she was sent to the Northern Hospital for the Insane, and died there March 10, 1877.   Up to the time she last returned from Iowa, her memory seemed good.   During the year 1875, and certainly as late as February, 1876, she wrote clear, sensible and perfectly coherent letters to her relatives in Iowa about business matters and in regard to the management of some loans she had made in that state.   To our minds, these letters are entitled to considerable weight as bearing upon the question of her mental condition and testamentary capacity prior to, and shortly before, making the will.   They may not be conclusive upon the question whether she was sane when they were written; but it is not easy to believe they were the productions of a person stricken with chronic dementia — a type of insanity, according to the medical testimony, usually of slow progress, marked in its early stages by general impairment and enfeeblement of the intellectual faculties, and ending in mental decay and idiocy.   It may be true, as claimed by the learned counsel for the contestant, that mental perver-

sion and insane delusion do not exhibit themselves as soon in the correspondence as in the acts and conduct of the insane; but it seems hardly credible that one incapable of continued thought and attention, and who had nearly lost her intellectual powers, could have written some of these letters. But, to pass on, what is the evidence relied upon to show that the testatrix was incompetent, by reason of mental unsoundness and insanity, to make a valid will in April, 1876?

It is said by contestant's counsel, that the testimony overwhelmingly shows that her mind then was, and had been for a long time, full of insane delusions, not only upon particular subjects and in reference to a particular person, but upon all subjects. The facts relied on to prove unsoundness of mind and insane delusions on the part of the testatrix, before and at the time she made her will, are these: She was subject, the witnesses say, while she lived in Neenah, to frequent fits of crying and laughing without any apparent cause. Her conduct oftentimes was strange and unnatural. She was easily excited into passion and frenzy. At an early period she conceived a great dislike or antipathy for her husband, and every one connected with him, which continued to the end of her life. She was constantly complaining of him, and about his character, house and surroundings. She was very suspicious of him; accused him of stealing from her. She also accused others of taking her papers, opening her letters, and other things of like character. She believed her husband was meditating some fraud upon her rights, or intended leaving her or procuring a divorce. She took up the strange notion, on one or two occasions, that he had committed suicide, or was about to be murdered. Most of these suspicious apprehensions and fancies were doubtless groundless — the offspring of her peculiar temperament and nervous organization; for it is perfectly manifest, from all of the testimony in the case, that Mrs. Blakely was a very eccentric and peculiar person. She was excitable, nervous, flighty

In the Matter of the Will of Sarah M. Blakely.

and hysterical. She was suspicious of all, discontented and unhappy. Her married life was unhappy from some cause; whether through her own fault or the fault of her husband, is left in the dark. She was dissatisfied with her house, which was not as comfortable, well finished and furnished as the one she had lived in before her second marriage. There were defects in the house well calculated to worry and annoy any careful, prudent housekeeper. She always insisted that her husband had deceived her in respect to his home and its surroundings, and as to his pecuniary circumstances. What foundation there was for this complaint or charge, can never be known. But, considering her idiosyncrasies, her bad rupture and poor health generally, she might have been dissatisfied and fault-finding with any one under the most favorable conditions. For true it is, she was probably not one of those happily constituted persons who make the best of everything, and meet the rough and smooth in life with an equal countenance. Possibly her husband was in some degree responsible for her discontent, irrational conduct and constant complaining. The real home life of husband and wife is concealed from the public eye, and it is not easy to discover who is really responsible for domestic discord. Not unfrequently harsh language, cold manner, indifference to the wants and feelings of each other, a lack of sympathy and kind attention, alienate affection and create dislike between them as effectually as the most flagrant acts of cruelty. But, however this may be, we do not discover anything in the conduct, or foolish caprices, or ungrounded suspicions of Mrs. Blakely, which satisfies us that she was under the influence of insane delusions at the time she made her will, or was then wanting in testamentary capacity. Everything said or done by her is quite consistent with mental health in a person of her peculiar organization and temperament.

In its leading features and the facts relied on to prove insane delusion and chronic unsoundness of mind, the case is

very much like that of Chafin, 32 Wis., 558. Indeed, Chafin's life and conduct were more marked by the exhibition of wild vagaries, absurd opinions and foolish suspicions, and a bitter dislike of those who should naturally have been the objects both of his affection and bounty, than anything we find in the life and conduct of Mrs. Blakely. Yet it was held that all these mental peculiarities and eccentricities of character and conduct on the part of the testator were entirely consistent with the condition of sanity. The ruling of the circuit court in this case in respect to testamentary capacity, and as to what is proof of insane delusion, cannot be affirmed without overruling that decision. In the Chafin case, also, that which distinguishes insane delusion from mere caprice and eccentricity of character, is clearly pointed out, and the remarks of Mr. Justice Lyon on that subject are directly applicable to the testimony before us.

What constitutes a sound mind, within the meaning of the statute, or what degree of mental power the testator should possess in order to make a valid will, was a question incidentally considered or directly passed upon in *Holden v. Meadows*, 31 Wis., 284; the *Chafin case, supra;* and *Burnham v. Mitchell*, 34 Wis., 117; and need not be dwelt upon now. It is sufficient to say that the rule laid down on this subject by Judge Davies in *Delafield v. Parish*, 25 N. Y., 29, was adopted; which is, in substance, that it is essential the testator should have sufficient capacity to comprehend the nature of the act and its effects, and should perfectly understand the extent of his property of which he is disposing, and his relation to all persons who have claims upon his bounty.

The testatrix seems to have possessed this degree of mental power and understanding, and the evidence does not justify the conclusion that her mind was under the influence of any insane delusion which would pervert or disturb its faculties in making a testamentary disposition of her estate. The evidence further satisfactorily shows that the disposition which

she did make of her property was in entire harmony with her frequently declared purpose. She had often said that she intended to give her property to some religious or benevolent institution. The evidence does not inform us of the value of her estate, though it was stated by counsel on the argument, as we remember, that it would amount to about $6,000. By the will she gave her husband $250, which she states she let him have about six years before, and which he was to repay with ten per cent. interest; and the rest of her property she gave to the Home for the Friendless in the city of New York, to the American Tract Society, and to the *American Bible Society* — the great bulk of her property being given to the latter institution. Now, how can we say, looking at the will alone, that this was not a suitable and perfectly proper disposition for her to make of her property under the circumstances? It must be borne in mind that the law allows a person of sufficient capacity and requisite age " to do as he will with his own." The courts have no right to control the exercise of this power because the disposition made does not seem just and natural. The testatrix had said to more than one witness that she was under no obligations to her relatives; that they had never helped her, or that they were well enough off; and that she would not leave her husband anything, because he had not treated her as he should, and had misrepresented things to her before marriage. She had apparently fully meditated upon the subject, and this was the disposition which she was resolved to make of her estate.

There is one, and it seems to us very unimportant matter, which was considerably commented on by the counsel for the contestant, and which perhaps requires a passing word. Mr. Conlan, who drew the will as dictated by Mrs. Blakely, testified that she asked him on that occasion a good many questions, and wanted to know whether he did not think " it would be a good thing to give her money to the *Bible Society*, because there were a good many people who had no Bibles, saying she

did not believe in the Bible herself." It is said that it is strong evidence of an unsound mind, that she should leave her property for the dissemination of the Bible, which she did not believe in. This might be so could we rely on the correctness of this statement of the witness. But we have no doubt that he misapprehended the meaning of the testatrix. Her whole life, so far as we know anything about it, contradicts and disproves the statement. She was a member of the Presbyterian church, frequently attended divine worship, and was familiar with the Bible, as the little incident related by Mrs. Fanny Morris, about helping *Mr. Blakely* and the witness's mother recall an unfamiliar Bible name, amply shows.

Much reliance is placed upon the medical testimony offered on the trial by the counsel for contestant. Dr. Barnett was sworn on the part of the proponent, and testified that he attended professionally on Mrs. Blakely in 1873, 1874 and 1875, and that in these visits he discovered nothing in her which would incapacitate her for business; that he saw no signs of insanity, nor any evidence of delusion. After the paralytic stroke in December, 1875, he discovered very great mental enfeeblement, so much so as to be unsoundness or insanity of the peculiar type called dementia, *in some degree.* He saw her in February, 1876, but recollects no particulars of that visit, and says nothing about her mental condition at that time. He closed his testimony by saying that he should not consider her as being in a proper condition of mind to attend to business in the spring of 1876. Dr. Hunt, a witness on the same side, saw Mrs. Blakely several times in the summer of 1876, when she was with her friends in Iowa, three times professionally. He says she acted like an old person who had become weak and childish, but showed no indications of insanity, and that he did not have a suspicion that she was insane. Dr. Russell, also a witness for the proponent as a medical expert, gave a description of the characteristics of dementia. He says that from its commencement it diminishes and grad-

ually weakens the powers of the intellect. Some things which appeared unnatural and strange in the conduct of Mrs. Blakely, he thought might be the result of nervous excitement or transient delusion, and might attend sanity. Dr. Kempster, the superintendent of the Northern Hospital for the Insane, was sworn for the contestant. He states that he examined Mrs. Blakely when she was first brought to the hospital in September, 1876, and saw her frequently afterwards. He says she was a diseased person when he first saw her, and was insane; that her type of insanity was dementia, usually a chronic disease; that she was in an advanced stage of the disease when she came to the hospital. At this time she expressed fear of personal violence; that people would take advantage of her, and that she would receive bodily harm from some indefinite source. This is the first time that we learn that she was under any such delusion, and it must have come upon her at a recent period, or other witnesses would have spoken of it. The doctor does not believe in any such thing as partial insanity. He gave it as his opinion that Mrs. Blakely must have been of an unsound mind in April, 1876. Indeed, the doctor seemed to think that dementia in its first stages necessarily disqualifies a person from transacting business, and that as early as 1873 the testatrix had not sufficient strength or vigor of intellect to make a valid deed. This, in short, is the substance of the medical testimony; and it must be apparent that it does not afford a very safe and satisfactory guide to a decision of the question at issue. Taken altogether, it leaves the mind in great doubt and perplexity as to the real mental condition of the testatrix before and at the time she executed the will.

Dr. Kempster is certainly a high authority on the nature of the disease of insanity. He has made the disease a special study for years, and has been largely engaged for a long time in the treatment of the insane. Yet the rule he lays down in

regard to insanity would be a dangerous one to apply in the business transactions of life. He thinks the testatrix was incapable of making a contract as early as 1873; yet at this time, and for more than two years afterwards, her family physician, who visited her many times, saw no indications of unsoundness of mind, no weakness of her intellectual powers, and no mental disorder. She attended to her own affairs then and afterwards in an intelligent manner, and wrote the letters to which we have already referred. It is very obvious that there is a great divergence in medical and judicial opinion in regard to the effects of insanity upon the mind, doubtless owing to the different standpoints from which the subject is considered. In the *Parish Will Case*, 25 N. Y., 115, Judge SELDEN alludes to this in the following language: "If a medical witness comes to the conclusion, from the mental manifestations of an individual, that his mind is disordered, that he is insane or imbecile, and from this infers that his brain is diseased, and then tells us that this disease of the brain must necessarily destroy the intellectual powers, we have gained nothing whatever from medical science; we have simply reasoned in a circle. We have arrived at the end of the inquiry as to mental capacity before touching upon the connection between the mind and the brain, which connection alone brings the question within the scope of that science. Physicians are not necessarily metaphysicians. Their science relates to the physical man, and to his moral and mental condition only as connected with his physical. Their opinions, therefore, can be considered as properly scientific only to the extent in which this connection is involved. So far, then, as the medical opinions in this case bear upon the degree of cerebral disease indicated by the apoplexy, the paralysis, the loss of speech, the convulsions and other physical symptoms, they are to be regarded as the opinions of experts. But in so far as they rest upon the evidence going to show a want of intel-

lect directly, and not merely as the result of disease of the brain, they derive very little, if any, additional force from the professional education of the witnesses."

Judge COOLEY makes some very sensible and discriminating remarks as to the value of medical expert testimony, and the weight to be given to it in this class of cases, in *Fraser v. Jennison*, a case recently decided by the supreme court of Michigan. (See The Northwestern Reporter, January 10, 1880, p. 595.) He says: "But it would be in a high degree dangerous, as well as unjust, to deprive a man of the control of his property as soon as the indications of mental disease appear, notwithstanding he may still be managing it with propriety and judgment. For legal purposes, incapacity, either criminal or civil, must be judged of by manifestations in conduct and language. The circumstances and symptoms of mental disorder may aid in understanding the manifestations subsequently appearing, but they can have little further value. The expert can never be put in the place of the jury, and be allowed to decide the case on his opinion of what was naturally to be looked for in the mental history of a person shown to have had peculiar surroundings and a peculiar experience." And the learned judge adds this pertinent and weighty observation, which it is well to bear in mind, namely, that "there is no doubt that the law of insanity is in danger of falling into contempt in testamentary cases as well as in criminal, and very largely because the examination of experts is conducted under an apparent belief that the slightest taint of mental disorder destroys capacity, even though the conduct has apparently never been affected by it." The Fraser case is instructive, and has a direct bearing upon some of the questions we are considering. There the testator was 83 years of age when he made his will, dated May 17, 1877, and, as we infer from the question put to a medical expert, became a raving maniac in a few weeks after, dying August 2d following. The medical witness had stated, on a supposed case,

that the testator was not in a sound mind when he executed his will; but the will was sustained by the court.

Now Dr. Kempster testified that in his opinion there was no such thing as partial insanity; that a man was either sane or insane. This may be true considered in the light of medical science, but it is not true in the law, as is apparent from the decisions of some of the most eminent and distinguished jurists who have adorned the bench in this country and in England. For the testamentary dispositions of monomaniacs have often been sustained in spite of their mental disorder, where the insane delusion did not influence the mind of the testator in disposing of his property, or in bringing about such a disposition as would not have been made if his mind had been sound.

We have not time to notice all the items of evidence relied on by the counsel for the contestant to show that the testatrix was of unsound mind when she made her will. We have alluded to so much of the evidence as we deemed most important and material, bearing on the question of insanity; and, as already indicated, our conclusion upon the evidence is, that the testatrix was laboring under no insane delusion when she executed the will, nor were her mental powers so feeble that she was then wanting in testamentary capacity, within the statute.

It follows from these views, that the judgment of the circuit court must be reversed, and the cause be remanded to that court with directions to affirm the order of the county court admitting the will to probate.

*By the Court.* — So ordered.