BUCHER, Respondent, vs. WISCONSIN CENTRAL RAILWAY COMPANY, Appellant.

*February 18—June 3, 1909.*

*Railroads: Master and servant: Injuries to brakeman: Contributory negligence: Assumption of risk: Questions for jury: Failure to submit: Trial: Special verdict: Failure to request submission of questions: Appeal and error: Assignments of error: Witnesses: Competency: Experts: Osteopaths: Verdict based on opinion evidence: Conclusiveness: Damages based on sexual impotence: Duty of court: Effect of expert testimony as to personal injuries: Weight and sufficiency of expert evidence: Excessive damages.*

1. Where the evidence is conflicting the question of contributory negligence is for the jury.

2. In a personal injury case submission as part of the special verdict of a question concerning the contributory negligence of plaintiff, together with an instruction: "If you find that the plaintiff knew or had reasonable means of knowing the danger of coming in contact with" the obstruction causing his injury, the jury should answer the question "yes," sufficiently covers the question of assumption of risk.

3. Where there is no request to submit a question as part of the special verdict, but merely an exception taken to the verdict because it fails to contain such question, error cannot be assigned thereon.

4. Where an examination goes far enough to qualify osteopaths as medical experts for some general purposes relevant to the cause on trial and covering to a considerable extent questions objected to, error cannot be assigned because plaintiff did not show the witnesses had any knowledge from actual experience in similar cases, in the absence of cross-examination to bring out such facts.

5. While the verdict of a jury founded upon facts is entitled to great weight and is almost conclusive in the supreme court if supported by any evidence, yet a verdict founded only upon the opinion of experts concerning the cause of a condition, which condition is itself established by the opinion of experts, has not such weight.

6. Opinions of medical men may be rejected as an insufficient basis for a finding of fact by a jury where the court is convinced that reasonable certainty is outside of the possibilities of the situation.

7. Obvious error of opinion based on insufficient data may be disregarded by the supreme court as a basis for supporting a verdict.

8. Damages based on sexual impotence and the evidence to support such damages will be closely scrutinized by the supreme court and limited within proper bounds.

9. A verdict for damages, based on sexual impotence resting on opinion evidence which does not commend itself to the supreme court as reasonable or sound, will not be given the weight to which a verdict is entitled where it rests upon facts.

10. It is improper for a medical expert who did not see the patient until five months after an alleged injury to the head, and who had no certain or satisfactory data upon which to base an opinion of sexual impotence as the result of the injury, to testify as to the possible consequences of impotence: "It may go on for years, and might possibly terminate in something more serious."

11. In an action for personal injuries, testimony of medical experts that such conditions as they observed might have produced the injury alleged merely affirms that the injury was in their opinion sufficient to have produced the condition complained of, not that it did produce it.

12. Where the general unreliability of expert testimony is accentuated by a showing that the expert has little or no data upon which to base an opinion, that the subject upon which he expresses an opinion is one of great doubt and difficulty, and he demonstrates his lack of knowledge by his testimony, his opinion is insufficient to support a verdict seemingly unjust or excessive.

APPEAL from a judgment of the circuit court for Winnebago county: GEO. W. BURNELL, Circuit Judge. *Reversed.*

For the appellant there was a brief by *Walter D. Corrigan, Wm. A. Hayes,* and *Clifton Williams,* and oral argument by *Mr. Hayes.*

For the respondent there was a brief by *Bouck & Hilton* and *John F. Kluwin,* and oral argument by *Mr. Kluwin.*

The following opinion was filed March 30, 1909:

TIMLIN, J. The negligence charged against the defendant consists in its maintaining alongside of its main track at or near the station called Lake Villa a standpipe or water plug in such proximity to the track as to be dangerous to employees of defendant in the ordinary discharge of their duties. The appellant, by motion for a directed verdict and otherwise, raised in the court below, and now presents to this court (1) that there was no evidence sufficient to go to the jury upon the question of defendant's negligence; (2) that the uncontroverted evidence affirmatively shows contributory negligence on the part of the plaintiff.

The evidence tends to show that the upright part of this pipe was twenty-two inches from the step on the side of the engine cab used for entrance to the cab, and that this was too near for safety. The question of defendant's negligence upon this ground was fairly for the jury. Upon the question of the contributory negligence of the plaintiff there is strong evidence on the part of defendant to show plaintiff guilty of such negligence. But the testimony of the plaintiff is, in substance, that in the regular discharge of his duty as head brakeman in the usual manner under the circumstances shown, and with the kind of train shown, he was standing on the steps leading into the engine cab, holding the hand rails, leaning outward and looking back toward the rear of the train where the conductor was, for the purpose of receiving from the conductor and transmitting to the engineer the signal to pull out, which had not yet been given, but was momentarily

expected. While in this position and when unaware of the proximity of the standpipe he was brought in contact with the standpipe by the moving train and knocked off the steps and injured. Printed rules confessedly brought to the notice of the plaintiff are offered in evidence, and contain general words of warning, and directions to employees to acquaint themselves with the risks of their business and the location and distance of objects near the track, including standpipes, but no specific standpipe or other object is designated, and the rules themselves are in their general import merely declaratory of the duties and responsibilities resting upon employees by law. Upon this showing the question of plaintiff's contributory negligence was for the jury.

Error is assigned because the court failed to submit in the special verdict the question of plaintiff's assumption of the risk. The court did, however, submit a question numbered 6 covering the contributory negligence of the plaintiff, and instructed the jury as follows:

"If you find that the plaintiff knew or had reasonable means of knowing the danger of coming in contact with the standpipe, you should answer the sixth question 'Yes.' "

This authorized the jury to affirm the contributory negligence of the plaintiff under the circumstances stated in the question above quoted, and covered the assumption of risk under the evidence presented in the case. There could be no assumption of risk unless the plaintiff "knew or had reasonable means of knowing the danger of coming in contact with the standpipe," and if he had this knowledge or reasonable means of knowledge there was an absolute direction to find him guilty of contributory negligence. This was sufficient. Besides this, there was no request that the court submit a question in the special verdict covering assumption of risk, but merely an exception taken to the verdict because it did not contain such a question. This assignment of error cannot prevail.

The plaintiff presented two expert witnesses, who testified that they were osteopaths, holding diplomas from an osteopathic school of medicine and licensed to practice osteopathy in this state by the board of medical examiners. They also testified that they were required to study and have knowledge of the anatomy of the human body, including the nervous system, and they were required to be learned generally in all branches studied and practiced by regular physicians, except the *materia medica*. It is objected that the plaintiff has not shown that they had any knowledge from actual experience in similar cases, and this would perhaps be a good objection were that fact affirmatively shown. But the defendant omitted the usual preliminary cross-examination with reference to their qualifications and omitted on the regular cross-examination to bring out this fact, and then moved to have their opinions stricken out on this ground. This objection was therefore not well taken. The plaintiff went far enough in the first place to qualify these osteopaths as experts for some general purposes relevant to the case and covering to a considerable extent the questions asked. *Bloch v. Am. Ins. Co.* 132 Wis. 150, 112 N. W. 45; *Kath v. Wis. Cent. R. Co.* 121 Wis. 503, 99 N. W. 217. This assignment of error cannot prevail.

Other errors assigned and argued in the brief of the appellant need not be noticed, because the judgment of the court below must be reversed for two reasons so allied that we shall consider them together.

One of these is that the damages are excessive and rest largely upon incompetent evidence, and the other is that opinion evidence bearing upon the question of damages sustained by the plaintiff was improperly admitted. A summary of facts bearing upon these questions may be given as follows: On September 26, 1906, the plaintiff was injured as stated, and on the same day he was examined by Dr. Pullen, a physician in the employment of the defendant, who then made a written memorandum of plaintiff's condition. There was a

contusion on the back part of the head and upon the right hip.
The injury to the head was a small swelling of the scalp about
as large as a walnut on the back of the head.   The scalp was
not cut.   There was a contusion on the right shoulder and
the lip was slightly lacerated, but not enough to break the
skin or draw blood in either case.   This was the extent of
his visible injuries.   He made no complaint about his ear,
but he complained of pain in the left testicle, and this the
doctor examined and found a small chronic varicocele.
The evidence of the train crew with the plaintiff at the time
of the injury also indicated that plaintiff's injuries were
slight.   The plaintiff testifies that he was in good health,
of sound hearing and sight, and sexually potent prior to the
injury, but not since the injury; that he has suffered pain and
dizziness continually since the injury.   According to plaint-
iff's own testimony he was in bed only about a week, and he
went to work again in November for one Green, doing gen-
eral horseshoeing at $2.50 per day, and worked at this until
the middle of January, 1907, sometimes five days in a week
and sometimes four and one-half days.   He also worked ir-
regularly after this at other work.   In February or March,
1907, he called in Dr. Corbitt when he was suffering from an
acute attack of the grippe, and in this condition Dr. Corbitt
first saw him.   Plaintiff was then complaining a good deal of
pain in his head, was sleepless, and had a moderately high
temperature.   Dr. Corbitt called on him twice after that,
and for about two or three months ensuing he called at the
doctor's office frequently, and on these occasions complained
about his head, eyes, and ears, of having a constant headache,
numbness in his arms, and pains.   The doctor made tests
and was convinced that there was such numbness, and found
him quite nervous, and advised rest.   The doctor said:

"He complained also at that time of being impotent.   He
complained of his eyes and his ears.   I examined his ear.   I
advised him to see a specialist on the eye and ear.   I thought
at that time possibly that the persistent headache might be
due to some eye strain."

The doctor went on to relate that the plaintiff complained of tenderness on the upper and lower part of his spine and the doctor thought there was such tenderness. The nerve controlling the erection of the penis is contained in the *sacro plexis,* and it was tender about that region. The brain, spinal cord, and the perval nerves all take part in the phenomenon of the erection of the penis.

After an interval of three months or more, during which plaintiff was at his home and not having any medical attendance, and shortly before the trial, the doctor examined him again and found his condition practically the same, except that plaintiff had lost in flesh. Dr. Corbitt went on to explain the erectile action of the penis, the cause thereof, the outflow of blood which produces this action, and stated that he believed from an examination of the case and the injury that there is in the instant case sufficient injury to either the brain or the spinal cord to cause impotence. In his opinion this condition of impotency resulted from an injury by a blow on the back of the head caused by coming in contact with the standpipe while riding on the side of a train moving at fifteen miles per hour; the blow being sufficient to cause temporary unconsciousness, and the fall being sufficiently violent to prevent plaintiff from continuing his work and so that he had to be assisted to get on the train and had lain in bed thereafter for five days and was prevented from working for several weeks. The questions to the doctor in this regard were very faulty, but not objected to. Dr. 'Corbitt also gave as his opinion that the plaintiff was not at the time of the trial physically able to work, and that his pain, numbness, and dizziness are probably *pettimal,* the mildest form of epilepsy, which the doctor thought was the direct result of the injury, but it might possibly be due to the ear trouble from which plaintiff was suffering. The impotency is in his opinion probably permanent, and the effect of impotency on the "general system" of a man thirty-three years old is to make him a neurasthenic, which describes a condition of nerve ex-

·604    SUPREME COURT OF WISCONSIN.    [JUNE

Bucher v. Wis. Cent. R. Co. 139 Wis. 597.

·haustion.  This condition he describes as a "general lassi-
tude, a great deal of nervousness, and in some cases it may go
·on until they are bedridden, and might possibly terminate in
something more serious."  Upon cross-examination he said
he found the· plaintiff suffering from a mild form of vari-
·cocele.

Dr. Brazeau, a specialist in diseases of the eye, nose, and
·throat, examined the plaintiff· for the first time March 17,
1907, and found him then suffering from suppuration of the
middle ear.  The drum was perforated in the anterior and
interior portion about the size of half a pea, the small bones
were inflamed and adhered to one another, and plaintiff com-
·plained of headache and dizziness.  This doctor was quite
·cautious and conservative and did not go to the length of the
first witness, but finally said that if the standpipe had struck
·plaintiff right over the ear it could have caused the condition
described in the middle ear, but gave no opinion to the effect
that the actual injury received could cause the condition he
·observed, rather the contrary.

One of the osteopaths testified to the existence of a "bony
lesion," which he described in this luminous language: "Why,
·it is any opposition between that bone and other bones in its
·vicinity otherwise than normal, in a position besides a normal
position."  He was then asked:

"*Q.* Assuming that ·the plaintiff in this case, whom you
examined, on the 26th of September, 1906, while riding upon
·the side of a train going from ten to fifteen miles an hour,
was struck a violent blow in the back of the head which
knocked him to the ground, might that lesion that you found
·have resulted from such injury ?"

Objection having been made and overruled, the witness
·answered, "Well, that lesion might result from such injury
as you describe."  An additional impairment of plaintiff's
condition was described by this expert as follows:

"The very sensitive condition of the spine and the muscles
·along in the middorsal region I attributed to irritation to the

nerves that supplied them, where they merge and send a branch to the muscles of motion or sensation, and also with the sympathetic system. Those nerves that come back and supply those muscles, they were affected on account of that abnormal condition of the spine in the middorsal region. That would produce a painful condition, painful area, and it might also be due to a deeper seated condition in the spinal cord itself."

This, he says, would incapacitate plaintiff for work to a great extent and cause him pain. He found sensitiveness in the lumbar region; "the lumbar vertebræ being those from the hip bone up to the twelfth dorsal, which is the one which the twelfth rib is attached to, and in that area there are nerves which connect with the penis." He was then asked a similar question to that before quoted, and he answered similarly that this second set of "abnormal conditions" might have been so caused.

The second osteopath found upon an examination of the plaintiff, to quote his own words, "that the relationship on the left side between that articulation, between the occipitus or base of the head, is backward in relationship, with its proper position on the atlas on the left side." Against objection he was asked and answered that this condition might have been caused by an injury such as the plaintiff sustained at Lake Villa, describing it generally. He also thought the plaintiff was probably suffering partially from nervous exhaustion.

The jury returned a verdict for plaintiff, assessing his damages at $4,000. It will be observed that there was a period of apparent health and ability to work of about five months intervening between the injury at Lake Villa and the attack of the grippe, and that these expert opinions were given by men who first saw him after he was afflicted with the grippe. It will also be observed that, in addition to the testimony of the plaintiff that these disabilities began after his injury, the nervous exhaustion and sexual impotence and "bony lesion" or "abnormal condition" of the plaintiff are

·connected with the injuries sustained by him on September 26, 1906, by the opinion of experts that these conditions were ·so caused or that they might have been so caused. It is further noticeable that the impotence of the plaintiff is put forward as a substantial ground of damages. The verdict of a jury founded upon facts is entitled to great weight, and is almost conclusive upon this court if supported by any evidence. But the verdict of a jury founded only upon the opinion of ·experts concerning the cause of a condition, which condition is itself established by the opinion of experts, has no such weight. As was said in *Baxter v. C. & N. W. R. Co.* 104 Wis. 307, 330, 80 N. W. 644, 652:

"Opinion evidence alone is not conclusive in any case. The jury must pass upon the probabilities, and unless the ·opinion relied on is within the scope of reason and common sense it should not be regarded at all." *Johnson v. G. N. R. Co.* (Minn.) 119 N. W. 1061.

With reference to the weight to be given to opinion evidence, it is noticeable that opinions concerning value may be rejected if the facts on which the opinion is predicated are not sufficient to justify an opinion. *Lynch v. Troxell,* 207 Pa. St. 162, 56 Atl. 413. So in regard to the opinion of a physician concerning the value of the services of a nurse (*Cameron M. & E. Co. v. Anderson,* 34 Tex. Civ. App. 229, 78 S. W. 971); the value of the use of a vessel (*The Conqueror,* 166 U. S. 110, 17 Sup. Ct. 510); the value of a mine (*Glasier v. Nichols,* 112 Fed. 877); the value of a trotting horse (*Chicago & N. W. R. Co. v. Calumet Stock Farm,* 96 Ill. App. 337; *S. C.* 194 Ill. 9, 61 N. E. 1095); the value of the personal property of a city (*Winter v. Montgomery,* 79 Ala. 481); or the value of a contract of partnership (*Reed v. McConnell,* 101 N. Y. 270, 4 N. E. 718). So, where a lay witness is permitted to state his opinion of the mental condition of one whose capacity is under investigation, he is required to give a statement of facts observed by him upon

which this opinion is founded, and the value or weight of his testimony will often turn on whether he has any basis of fact for his opinion. *Crawford v. Christian,* 102 Wis. 51, 78 N. W. 406; *Boorman v. Northwestern Mut. R. Asso.* 90 Wis. 144, 62 N. W. 924. In the last-mentioned class of cases it has been variously ruled either that the opinion is incompetent or the evidence of no probative value. Id. Opinions of medical men may be rejected as an insufficient basis for a finding of fact by a jury where the court is convinced that reasonable certainty is outside of the possibilities of the situation. *Spear v. Hiles,* 67 Wis. 361, 30 N. W. 511.

In an inquiry relative to testamentary capacity the opinions of physicians were held not conclusive in this court, notwithstanding they had the aid of the finding below and were corroborated by some facts, because contrary to common knowledge. *Will of Blakely,* 48 Wis. 294, 4 N. W. 337. Where the damages awarded plaintiff were large and rested in part on the opinion of a physician to the effect that the physical and mental defects he observed in a child nearly two years old were caused by imprisonment of the mother during pregnancy, the judgment was reversed by this court, Justice LYON saying:

"In view of the fact that it is common knowledge that there are numerous causes for physical, mental, or nervous deficiency in children; that healthy women do sometimes give birth to deficient children; that nervous or otherwise unhealthy women often bear healthy children; and that Dr. Robinson detected no defect in the plaintiff's child until it was nearly a year and a half old,—we think the authorized limits of expert testimony were greatly exceeded when he was allowed to give his opinion that the deficiency in the plaintiff's child was caused by the nervous prostration of the plaintiff during her pregnancy." *Spear v. Hiles, supra.*

Where a verdict for damages rested in part upon opinion evidence of a physician "that plaintiff was liable—quite likely—to be bothered with the injury for several years and

might be always, at least under certain conditions, as over-
use," the judgment was reversed and the testimony quoted
described as conjectural. In the same case another physician
testified that tuberculosis in the family of plaintiff's parents
would show a strong susceptibility in all the family to tu-
bercular infection, particularly in parts injured, and there
would be great likelihood of such infection occurring or of
plaintiff's becoming so infected. This was held to be merely
conjectural. *Collins v. Janesville*, 99 Wis. 464, 75 N. W.
88. So that obvious error of opinion, opinion based on
insufficient data, or nonsense clothed in words of "learned
length," may be disregarded by this court as a basis for sup-
porting a verdict. Here one of the physicians finds a man
suffering from grippe and having a suppurated ear, and with
some indications of varicocele and in a fever, five months after
the man collided with the standpipe as described. The phy-
sician is of the opinion that the sexual impotence is not due
to the grippe nor to the fever nor to the suppurated ear nor
to the varicocele, but to the blow on the back of the head and
the fall received five months before, the severity of which is a
matter of proof unknown to the physician except by remote
inference from the statement that the train was going ten or
fifteen miles an hour and the plaintiff was rendered tempora-
rily unconscious, and ill as stated in the question. If the se-
verity of the blow is inferred from the headache, numbness,
pains, and impotence, and the latter disabilities are inferred
from the severity of the blow, the absurdity of the reasoning
is apparent. If the severity of the blow is inferred from the
position of the plaintiff at the time and the speed of the train
as given, the opinion is based upon mere conjecture because
given without reference to the description or to the extent of
the injuries or wounds actually inflicted. Dr. Corbitt did
not see these injuries or wounds. There is no evidence that
they were described to him. They were not included in the
question put to him. He did not consider that the plaintiff

had at the time, as testified by Dr. Pullen, chronic varicocele. Dr. Allen McLane Hamilton, in his work entitled "Legal Medicine," expresses the opinion that varicocele except in its earlier stages finally results in the production of both impotence and sterility. Vol. 2, p. 504. The witness wholly ignored the disease or sickness called grippe. See, also, Ogston, Medical Jurisprudence, 81, 82.

It is very easy to exaggerate before a jury the cause, effect, or probable permanency of such a condition as impotence. The same is true with regard to nervous disorders. Both are easy to feign, hard to disprove, exaggerated by auto-suggestion, and it is comparatively easy for an expert to have an opinion tracing either to a particular physical injury instead of to a disease, a mental condition, or a general impairment of health. If loss of sexual power is to be thrown into the scale as an item for which the plaintiff is entitled to be compensated in a personal injury case, common sense informs us that in practically all cases of severe injury, pain, suffering, or sickness there must be and ordinarily is during such period of stress a suspension of the sexual functions. This is also true of the lower animals. The consequence of considering this as an additional or independent item of damages must be that every sick or injured man may assert his sexual impotence as a ground for recovery additional to pain, sickness, or suffering, and thus duplicate damages. Cases may no doubt occur of direct injury to the generative organs in which some such ground of damages would not be a matter of mere conjecture, and what is here said has no reference to such cases. But if one in consequence of an injury is continually suffering pain and sickness, he is not apt to be concerned about his sexual powers or pleasures. If so, pain must have lost its usual distracting effects, and affliction its usual chastening consequences. In the instant case, if the plaintiff was sick and disabled to the extent he claims, he would in all probability be more concerned about his pain and sickness than about

his sexual potency when he consulted Dr. Corbitt, and there is a strong element of improbability in the claim that one really seriously ill and suffering pain, consulting a physician for relief, would also bring up the matter of his sexual impotence while in this distressful condition as an item of injury, instead of regarding it as a consequence of his pain and sickness, if he noticed it at all. Damages based upon any such ground and the evidence to support such damages will be closely scrutinized by this court and limited within proper bounds, and the verdict of a jury resting upon opinion evidence which does not commend itself to us as reasonable or sound will not be given the weight to which a verdict is entitled where it rests upon facts. We regard the recovery here as excessive upon the competent evidence. We are convinced that Dr. Corbitt had under the circumstances detailed, and five months after the injury, no certain or satisfactory data upon which to base his opinion that the impotency of the plaintiff, if it exists, was caused by the accident of September 26, 1906, or that it would be permanent. Neither was it proper for him to testify to the possible consequences of impotence in these words: "It may go on for years, and might possibly terminate in something more serious."

With reference to the testimony of the osteopaths, these gentlemen were put forward as expert witnesses; but they were not asked to give an opinion with reference to whether or not the peculiar conditions described by them were caused by the injury sustained on September 26, 1906. The question asked was, might such conditions as they observed have been so produced, and they answered that they *might*. Such testimony, if otherwise unobjectionable, is competent in corroboration of other evidence that the injuries were so produced. *Werner v. C. & N. W. R. Co.* 105 Wis. 300, 81 N. W. 416, and cases cited in opinion; *Conrad v. Ellington,* 104 Wis. 367, 80 N. W. 456. But this class of expert testimony merely affirms that the injury in question was in the opinion

of the witness sufficient to have produced the condition complained of, not that it did produce this condition. *Lyon v. Grand Rapids,* 121 Wis. 609, 99 N. W. 311, and cases cited in opinion. It is very remote, and its use generally is to refute a claim by the opposite party that the condition complained of could not have been so caused. In some courts it is ruled out as incompetent. *Briggs v. N. Y. C. & H. R. R. Co.* 177 N. Y. 59, 69 N. E. 223; *Galveston R. Co. v. Powers* (Tex.) 105 S. W. 491, and cases cited.

It cannot be put forward as an expression of opinion that the condition of the plaintiff was caused by the injury of September 26, 1906. The conditions described by the osteopaths are not those testified to by Dr. Corbitt, but quite different. There is no evidence that the disabilities described by the osteopaths in the excerpts above quoted, or rather the abnormal conditions which they claim to have found, were caused by the injury in question, but their unintelligent testimony was put forward as if there was such evidence. For illustration, the following was testified to against objection:

"As I said, we found the atlas region first, the head itself and the atlas region, a very much contracted condition of the neck, and those contractures in themselves might tend to pressure on the nerves or artery or blood vessels in that vicinity. Then, going on further to the dorsal region, the part of the spine to which the ribs are attached, we found a very much impacted condition; that is, there was not the mobility that there is in a normal spine. The spine was abnormal in that region. Contractions existed there in a very sensitive area."

Much of the evidence of these osteopaths is practically meaningless, mere nonsense, and was no doubt prejudicial to the defendant. The testimony of experts is proverbially unreliable at best, even when the experts are learned and competent, because bias is almost unavoidable on account of our mode of selecting experts, and bias requires small basis upon which to ground an opinion. But where this unreliability is accentuated by a showing that the expert has little or no

data upon which to base the opinion (*Strong v. Stevens Point,* 62 Wis. 255, 22 N. W. 425), and the subject upon which he expresses an opinion is one recognized by the approved learning of the times to be of great doubt and difficulty, or where the alleged expert demonstrates his lack of knowledge by his testimony, such testimony will not be sufficient to support a verdict which to this court seems unjust or excessive.  *Baxter v. C. & N. W. R. Co.* 104 Wis. 307, 80 N. W. 644.

*By the Court.*—The judgment of the circuit court is reversed and the cause remanded for a new trial.

Winslow, C. J., took no part.

A motion for a rehearing was denied June 3, 1909.