KATH, Respondent, vs. WISCONSIN CENTRAL RAILWAY COMPANY, Appellant.

*March 24—April 19, 1904.*

*Railroads: Injury to employee: Expert testimony: Subjective symptoms: Warning of danger: Assumption of risk: Trial: Issues as to negligence: Proximate cause: Contributory negligence.*

1. In an action for personal injuries evidence as to statements of the plaintiff to his physician is admissible only when they were made for the sole purpose of obtaining treatment before litigation was begun or threatened.
2. An expert medical witness cannot state what he has learned entirely from medical works, unsupported by practical experience of his own; but on motion to strike out testimony it should be affirmatively shown to be within such rule of exclusion.
3. As to the engineer and fireman of an engine sent to assist in putting out the fire on a burning railway bridge whose exact location they knew, there was no duty on the part of the railway company to display signals or give other warning of the location and condition of the bridge; and such employees assumed the risks ordinarily incident to the work.

4. In an action for injuries to a locomotive fireman, caused by the fall of his engine through a burning bridge, the complaint charged specifically, among other things, that the engineer was negligent in failing to stop before reaching the dangerous place. This charge was apparently lost sight of on the trial. There is no affirmative evidence that it was abandoned and, though the issue was not covered by the special verdict, the form of the verdict itself shows that the charge was not deemed to have been proven by uncontradicted testimony. The jury found that failure to display signals or give warning of the danger was the proximate cause of the injury. *Held*, that this excluded another proximate cause, and plaintiff cannot have a judgment in his favor affirmed on the ground that the negligence of the engineer was conclusively established.

5. Whether the fireman was himself negligent in failing to warn the engineer of their approach to the burned portion of the bridge is *held*, upon the evidence, to have been a question for the jury.

APPEAL from a judgment of the circuit court for Fond du Lac county: MICHAEL KIRWAN, Circuit Judge. *Reversed.*

This is an action to recover damages for personal injuries. The plaintiff was a locomotive fireman in the employ of the defendant, and on the night of January 20, 1901, at about 9 o'clock p. m., the engine which he was firing fell through a wooden bridge, which had been partially burned, upon the defendant's road, and the plaintiff was seriously injured. The complaint charges negligence in three respects: (1) Failure to place warning lights or signals at the ends of the defective bridge; (2) the maintaining of a defective air brake upon the engine, which would not work when applied; and (3) the failure of the engineer in charge of the engine to stop the same before reaching the burned part of the bridge. The answer admits that the plaintiff was injured at the time and place alleged, but denies all negligence.

Upon the trial many facts were undisputed. The claim that the air brake was defective was abandoned. It appeared that the plaintiff had been fireman for the defendant since March, 1900, and had made some thirty-five trips over

the piece of road containing the bridge in question, about
one third of which trips were taken at night; that the bridge
was a wooden bridge, 617 feet in length, and about fourteen
feet above the surface of the water; that it was situated about
two miles west of the city of Stevens Point; that about mid-
way between the city of Stevens Point and the bridge is a
cut in the rock, called "Rock Cut," through which the track
passes, and about 1,300 feet west of this cut is a highway
grade crossing, and about a half mile further· west a short
bridge, ninety-four feet long, from which bridge the east end
of the bridge in question is about 1,200 feet distant; that the
railway track for a distance of about 3,500 feet east of the
bridge in question is level; that, about 6 o'clock p. m. on the
day named, a fire started in about the center of the bridge,
and soon thereafter information of the fire was conveyed to
the depot at Stevens Point, and a switch engine, with a crew,
went out from that city to attempt to put out the fire, return-
ing when the water in the tank was exhausted, and leaving
a number of men engaged in fighting the fire by getting water
in pails from the river below and throwing it upon the
bridge; that the plaintiff reached Stevens Point on the pre-
ceding day upon engine No. 122, and was at Stevens Point
on the evening in question, and at about half past seven said
engine, with a .caboose and its crew, were ordered to proceed
to the burning bridge to help put out the fire; that they pro-
ceeded, with the engine, tender, and caboose, to the bridge,
saw the fire as soon as they passed through the cut, and
stopped at the east end of the bridge and had conversation
with the men who were trying to put out the fire, and it was
decided that the engine should be run back to Stevens Point,
and turned around, so that the water tank would be in ad-
vance, and the water therein could be more readily thrown
upon the fire; that this was done; and occupied nearly half
an hour's time, and, when the engine approached again, it
had been turned around, and the water tank was ahead, both

the fireman and the engineer being in the cab of the engine; that the engine ran directly onto the burned portion of the bridge, which gave way, thus precipitating the engine onto the ice below and severely injuring the plaintiff; that the burned portion of the bridge was about seventy-five feet in length, and was near the middle, there being 278 feet east of the burned portion, and 264 feet west.

The engineer was not called as a witness. The plaintiff testified that when they approached the bridge on the second trip no fire was visible; that the engine started upon this second trip at a speed of about fifteen miles per hour; that he remembered passing through the cut and over the highway crossing; that then the engineer shut off the engine, and he (plaintiff) got down and shoveled in some coal; that he did not notice the smaller bridge; that after putting in the coal he kept a lookout, and asked the engineer if they were not near the bridge; that the engineer said: "No. Do not get excited. We are a good ways off yet;" that the engine was then going at the rate of from three to five miles per hour, the steam having been shut off. The plaintiff, on cross-examination, described the accident thus:

"After I got onto the bridge, I hollered at the engineer. I says: 'For God's sake, stop! We are gone.' I cannot tell you where the engine then was with reference to the south end of the bridge. It was on the bridge. After we struck the bridge, I hollered at him, and that was all. As soon as we struck the bridge he threw the engine into emergency—the air brake—and reversed the engine. That is, he threw the engine into forward motion. I saw him do it. I was sitting on the seat. I didn't see the fire, nor any reflection in the sky from the fire. I didn't have time to try to get out. I cannot say how quick it was after I made this expression to him that the engine went down. It was quicker than I had much time to think. I did not have time to get out at all, nor to jump off my seat. I went down on my side before I could get off my seat."

Certain rules of the defendant company were put in evidence, requiring the display of danger signals or the stationing of a person to warn approaching trains at or near any obstruction or danger upon the track. The evidence showed that there was no signal or person stationed at the east end of the burned bridge when the engine approached it. There was considerable testimony contradicting the plaintiff's claim that when he approached the bridge for the second time no fire was visible. The evidence showed without dispute that the engine could have been stopped in a distance of from fifteen to twenty-five feet when it was going at the rate of from three to five miles per hour. The following special verdict was returned by the jury:

"1. While plaintiff, *William Kath,* was riding upon a locomotive of the defendant company over its railway, and was engaged in the performance of his duty as a locomotive fireman in the employment of the defendant, on January 20, 1901, about 9 o'clock at night, did plaintiff sustain personal injury by reason of said locomotive, with plaintiff therein, having fallen through a railway bridge situated upon and forming part of defendant's railroad track, about two miles northwest from Stevens Point, Wisconsin? *Answer* (by the court by consent of counsel). Yes.

"2. Was the injury which plaintiff sustained caused by the defective condition of said bridge, which resulted from the weakening and partial destruction thereof by fire on January 20, 1901. *A.* Yes.

"3. Did the defendant company, through Charles Parman, its foreman of the section in which said bridge was then situated, have actual knowledge of the defective condition of said bridge during a sufficient period before plaintiff was injured to have enabled defendant, by the exercise of ordinary care and vigilance, to have displayed lights as danger signals, and to have stationed men at said bridge, at and before the time of plaintiff's injury, for the purpose of warning approaching trains and locomotives of the location and defective condition of said bridge? *A.* Yes.

"4. Not considering the light, if any there was, proceeding from the fire in the bridge at the time when plaintiff was injured, did the defendant company fail to have then and there displayed any light, or fail to have then and there stationed any person, for the purpose of giving notice and warning to all approaching trains and locomotives of the location and condition of said bridge? *A.* Yes. As to light, we answer, they did so fail. As to having a person stationed there, we answer, they did so fail.

"5. When plaintiff made his first trip to the bridge on the night of his injury, did he then and there learn, or by the exercise of ordinary care should he have learned, that a portion of the bridge was destroyed by fire, to such an extent as to be incapable of supporting the weight of the locomotive? *A.* No.

"6. At the time when plaintiff was injured, was the fire which partially destroyed the bridge emitting light sufficient to have given timely warning of the location of the bridge to plaintiff as he approached on the locomotive, if he were then exercising ordinary care and vigilance in the performance of his duty? *A.* No.

"7. On the second trip to the bridge on the night of the injury, did defendant fail to give to plaintiff, or to any person on the locomotive, by or through any person stationed at or near said bridge, notice or warning of its location? *A.* Did so fail.

"8. Did the exercise of ordinary and reasonable care and vigilance require that, at the time when plaintiff was injured, the defendant should have had some person stationed or some proper light displayed at or near said bridge to give to the persons or to plaintiff's locomotive notice and warning of the precise location of the bridge, *A.* Yes.

"If both of your answers to the fourth question be 'No,' do not answer this ninth question.

"9. On his second trip to the bridge, and before the locomotive arrived there, on the night of the injury, did plaintiff know, or by the exercise of ordinary care and vigilance should he have discovered, that, excepting the light, if any, caused by the fire in the bridge, there was no light displayed nor person stationed at or near said bridge to give notice or warning of its location? *A.* Yes.

"10. Did any want of ordinary care on plaintiff's part

contribute to produce the injury which he sustained on January 20, 1901? *A.* No.

"11. Was the defendant's failure to display a proper light as a signal, and to station some person at the bridge to give notice and warning to plaintiff of the location of the bridge, the proximate cause of plaintiff's injury? *A.* Yes.

"11½. Is plaintiff now suffering from any spinal injury which is the natural and probable consequence of his fall from the bridge on January 20, 1901? *A.* Yes.

"If your answer to question 11½ be 'No,' do not answer the twelfth, thirteenth, nor the fifteenth questions.

"12. If the spinal injury exists, of which plaintiff complains, is it reasonably certain that the same will be permanent? *A.* Yes.

"13. If said spinal injury exists, is the same due either in whole or in part to plaintiff's having fallen from the ice run or inclined plane at Janesville on January 6, 1899? *A.* Neither in whole nor in part.

"14. If the court shall be of the opinion that the plaintiff is entitled to judgment in his favor, what sum will reasonably compensate him for the injuries which he sustained by reason of having fallen through said bridge while riding on said locomotive? *A.* Twelve thousand dollars.

"15. If your answer to the twelfth question be 'Yes,' then answer this: In the award of damages made by your answer to the fourteenth question, what sum, if any, is included as compensation for permanent injury to plaintiff's spine? *A.* Eight thousand dollars."

The defendant moved to change the answers to questions Nos. 5, 6, and 10 from "No" to "Yes," and the answers to questions Nos. 8, 11, and 11½ from "Yes" to "No," and to render judgment for the defendant upon the verdict as so amended. This motion being overruled, the defendant moved to set aside the verdict and for a new trial. This motion being also overruled, judgment for the plaintiff was rendered upon the verdict, and the defendant appeals.

For the appellant there was a brief by *Howard Morris* and *Thomas H. Gill,* and oral argument by *Mr. Gill.*

*O. H. Ecke* and *H. E. Swett,* for the respondent.

WINSLOW, J.   An objection to certain evidence will be
first considered. The plaintiff was injured in January, 1901,
and commenced this action in the following April.   Dr.
Gavin treated him regularly from the time of his injury until
the following October.   Dr. Baker was consulted by plaintiff
August 13, 1901, and made an examination of the case at
that time, and a further one on the 3d of September follow-
ing, and treated the plaintiff as a physician regularly after
the first examination.   Dr. Baker was put on the stand by
the plaintiff, and asked to state what the plaintiff said to him
as to his injuries and feelings at the time of the first exam-
ination—in other words, to state subjective symptoms.   Ob-
jection being made to this testimony as incompetent, irrele-
vant, and immaterial, and as self-serving statements made
for the purpose of having the witness testify to them as an
expert on the trial, the court allowed defendant's counsel to
examine the doctor preliminarily on the subject; and from
this examination it appeared that some two weeks before Au-
gust 13, 1901, one of the plaintiff's attorneys met the wit-
ness on the street and said that he had a man whom he would
like to have the doctor examine, and that he wanted to find
out exactly what ailed him, but did not state for what pur-
pose, nor give the proposed patient's name; that when plaint-
iff came, and was first examined, he (Dr. Baker) did not
know he was the man to whom the attorney referred; he
knew he had been injured on defendant's railroad, but was
not certain whether he learned that there was litigation pend-
ing at that time or on September 3d; that he learned that he
was to be called as an expert on the last-named date, and then
made another examination, taking notes; that he commenced
to treat the plaintiff in August.   On this statement the wit-
ness was allowed, against objection and exception, to relate
fully all the statements made to him by the plaintiff as to his
condition at the time of the first examination, in August, on
the ground that the witness was in good faith treating the

plaintiff as a physician, and hence that statements made by the patient were admissible under the rule laid down in *Keller v. Gilman,* 93 Wis. 9, 66 N. W. 800. In that case there was an attempt made to formulate the rules governing the admission and rejection of evidence as to subjective symptoms of a patient in a way which should cover all cases. The present contention shows how futile the attempt was. It was there said that such statements may be given in evidence when made to a physician for the purpose of treatment, but may not when made to an expert after action brought in order to enable him to testify as a witness on the trial. This seems clear enough until a case is presented like the present, where the statements are made both for the *bona fide* purpose of treatment and to enable the physician to testify as an expert on the trial. On principle, we think such testimony should not be admitted. It seems to us to be equally as objectionable as the evidence of subjective symptoms made to a physician for the *sole* purpose of enabling him to testify as an expert. Whenever such statements are merely narrative, and not part of the *res gestæ,* their relation on the witness stand is purely hearsay testimony. The rule which admits them when made in good faith before action solely for the purpose of treatment is an exception to the general rule excluding hearsay testimony. The exception is evidently based upon the idea that there can be no reasonable probability that such statements are made with any self-serving purpose; that there is every reason to believe that they are true, because it would be absurd, not to say stupid, for a patient to make false statements to a physician who is to treat the disease, and who must base his treatment in part on such statements. While there is not that strong probability of truth which is held to make admissible a statement made in the immediate view of death, there is some similarity in the two cases, in this: that the circumstances seem in each case to negative the idea that testimony would be manufactured, and, on the other

hand, to indicate that there would be every inducement to state the truth. It is evident that this condition only exists where the patient seeks a physician for the *sole* purpose of obtaining treatment before litigation is begun or threatened. If he joins with that purpose an intention to call the physician as an expert upon the trial of his case, whether then pending or to be commenced, then there is distinctly present the temptation to manufacture testimony when stating his symptoms and feelings to the physician. An easy way is thus opened to put any quantity of self-serving *ex parte* statements before the jury, by simply employing an expert to give a few days' treatment to the patient, and then putting the expert on the stand in his dual capacity of expert and attending physician. The case of *Cleveland, C., C. & I. R. Co. v. Newell,* 104 Ind. 264, 3 N. E. 836, is cited to us in support of the ruling of the court, and it is fair to say that it seems to do so; but the reasoning is not satisfactory to us, and we hold that evidence of declarations made by a patient to 'a physician after action is brought or threatened is inadmissible, where it is proposed to call the physician as an expert, notwithstanding that the patient may at the same time, in good faith, be seeking and receiving medical treatment.

A minor question arises upon the motion to strike out a part of the cross-examination of Dr. Minahan, a medical expert called by the plaintiff, who had made a recent physical examination of the plaintiff. Dr. Minahan had testified to the fact that he found atrophy or flattening of one of the spinal muscles, and that, in his opinion, the cause of the flattening was that the nerves supplying those muscles had been injured, but that the name of the nerve is not given in the authorities, and he did not know from his own experience what nerve it was; that he could not come to a conclusion as to the cause of the flattening of the muscle without the aid of some authority; that he was testifying from his knowledge of what the authorities state under those circumstances. Mo-

tion was made to strike it out. It does not clearly appear just how much testimony the motion to strike out covered, nor does it appear affirmatively that the doctor never had a case of this kind or involving these questions. The rule is that an expert medical witness cannot state what he learns entirely from medical works, unsupported by practical experience of his own, but the rule goes no further. *Zoldoske v. State,* 82 Wis. 580, 52 N. W. 778. We cannot say that it appears that such was the case here, and, in the uncertain state of the record as to the scope of the motion to strike out, we are unable to say that there was prejudicial error in the ruling.

Passing now to questions involving the merits of the controversy, we first meet the question whether the defendant's motion for a directed verdict should have been granted. Upon this question the defendant's argument is that the only ground of negligence claimed was the failure of the men at the burning bridge to give warning signals or station a man at the end of the bridge as the engine approached the second time, and that the rules requiring the giving of signals when any break or obstruction in the track is discovered do not apply where employees knowingly start out to repair or attend to the very defect in question, and know its location. It is impossible for us to see how the logic of this argument can be successfully avoided. The plaintiff and his colleague, the engineer, knew that the bridge was on fire and hence was necessarily a dangerous place. They had been informed of the fact, and, if that was not enough, they had been to the bridge and seen the fire themselves. They were sent to help put out the fire, and went without protest. They were experienced railroad men, and had passed over this very bridge numerous times, and knew its location. To say that they needed to be advised of danger when they approached the bridge the second time, by means of a lantern or other signal, seems well-nigh preposterous. The very mission they were sent on was an advertisement of danger and a warning to

approach with care. They certainly assumed all the risks that might ordinarily be expected to be present because of the weakening of the bridge by fire. Employees who voluntarily engage in building or repairing operations assume the ordinary risks always present in such operations. The rule that an employer must furnish a safe place to work has no proper application to such a situation. The place to work is being changed constantly, and is necessarily incomplete and dangerous; and the employee knows it, and accepts such risks as are ordinarily present in such operations. *Porter v. Silver Creek & M. C. Co.* 84 Wis. 418, 54 N. W. 1019; *Gulf, C. & S. F. R. Co. v. Jackson,* 65 Fed. 48; *Moon-Anchor C. G. Mines v. Hopkins,* 111 Fed. 298; *Armour v. Hahn,* 111 U. S. 313, 4 Sup. Ct. 433. When a man is employed for the express purpose of putting an unsafe structure in safe condition, it is absurd to say that the employer must have it in safe condition when the man goes to work. If such were the rule, how could unsafe structures ever be repaired or their condition investigated? Our conclusion upon this branch of the case is that as to the plaintiff and the engineer who were sent to co-operate in putting out the fire on the burning bridge, and knew its exact location, there was no duty to display warning signals. They knew all that warning signals could tell them, and more, and hence needed no signal.

If the failure to display warning signals were in fact the only ground of negligence claimed, the disposition of the case would be indeed easy, but such is not the fact. The complaint charges distinctly that it was the defendant's duty, through its engineer, to stop the engine before reaching the burned portion of the bridge; that the plaintiff relied upon the discharge of that duty; that the engineer negligently failed to discharge that duty, and because of such failure the engine fell through the bridge. Here is a definite charge of negligence by a co-employee clearly within the provisions of the second subdivision of section 1816 of the Statutes of

1898. For some reason not very clear to us now, this distinct ground of negligence seems to have been ignored by the trial court. Neither party suggested any question specifically covering it, as a proper inquiry to be embodied in the special verdict. The court, in framing the verdict, submitted no question and gave no instruction which in any way referred to it. And now, upon appeal to this court, the appellant claims, in effect, that the issue was abandoned, while the respondent claims that the engineer's negligence was proven by uncontradicted testimony, and that it was unnecessary to submit the question to the jury. As to the claim that the issue was abandoned, we find no affirmative evidence in the record showing such abandonment, while, as to the claim that the issue was unmentioned in the special verdict because it was proven by uncontradicted testimony, it is to be observed that the form of the verdict itself indicates that the trial court was endeavoring to include every fact in the verdict necessary for a recovery, whether disputed or not; otherwise questions 1, 4, and 7, as to none of which was there any dispute, would not have been included. Again, while the court was careful to ask the jury, by the eleventh question, whether the failure to display warning signals was the proximate cause of the plaintiff's injury, he utterly failed to submit any such question as to the alleged negligence of the engineer, and also failed to mention the subject when instructing the jury upon the eleventh question.

So far as we can judge from the appearance of the record, the question as to the alleged negligence of the engineer was lost sight of during the trial, and has in fact never been tried, though as matter of fact it is the only ground of negligence, since the claim of defective machinery has been abandoned, upon which the plaintiff can base any claim for a recovery. Even were it to be conceded, which it is not, that the evidence conclusively establishes the negligence of the engineer, still there is no finding that such negligence was the proxi-

mate cause of the injury, while, on the other hand, there is a direct finding that the failure to give warning or signal was the proximate cause of the injury. This finding manifestly excludes another proximate cause. The plaintiff stands upon it. He has made no motion to amend the verdict, and clearly is in no position to now shift his ground and claim, in direct contradiction of the verdict, that there was another proximate cause, proven by uncontradicted evidence, upon which he can fall back and support his judgment. So there can be no affirmance on this latter theory. These questions should have gone to the jury, and the question as to the failure to give signals and whether that was the proximate cause of the injury should not have been asked.

Again, it is claimed by appellant that contributory negligence was conclusively proven, because the plaintiff did not sooner warn the engineer of their approach to the burned portion of the bridge. We cannot so hold. It appears by the rule introduced in evidence that the engineer is in exclusive charge and control of the engine, the fireman being subject to his orders. The testimony shows that it was expected that the engine would approach very close to the burned portion of the bridge, in order that the water in the tank might be used. It appears that the plaintiff asked a warning question of the engineer shortly before they reached the bridge, and received an answer indicating that the engineer knew his whereabouts and wished no advice. If, after this question and answer, the plaintiff waited without further remark, anticipating that the engineer would stop the engine close to the burned portion, the court cannot say that such waiting is contributory negligence as a matter of law. It was clearly a question for the jury.

Appellant claims, however, that question No. 9, with its answer, by which the jury found that the plaintiff on his second trip knew or ought to have known that there was no signal displayed at the bridge, is in effect a finding of con-

tributory negligence.   It is evident that we cannot so hold. The considerations which we have just stated on the general subject of contributory negligence are essentially applicable here.

The appellant proposed a question for insertion in the special verdict, embodying the inquiry whether the fall of the engine was the result of a pure accident for which neither party was to blame.   This question was rejected by the court, and we think rightly   We have been unable to frame any reasonable hypothesis upon which a verdict of pure accident could be sustained.

The view we have taken of the case necessitates a new trial, for the reason that the real issue in the case has never been tried, and obviates the necessity of discussing the contentions made by the appellant that the answers to questions 11½, 14, and 15 are not sustained by the evidence.   While we have not given specific treatment to each error claimed by the appellant, it is believed that we have discussed in a general way all the questions of any importance raised upon the appeal. It is evident that upon a new trial the issues will be much simplified, and the special verdict, if one be rendered, should be reduced to a very few questions, in accordance with recent decisions of this court.

*By the Court.*—Judgment reversed, and action remanded for a new trial.