POWERS, Appellant, v. ALLSTATE INSURANCE COMPANY and others, Respondents.

*March 8—April 5, 1960.*

For the appellant there was a brief and oral argument by *Charles Saggio* of Milwaukee.

For the respondents Allstate Insurance Company and Charles Gurke, Jr., there was a brief and oral argument by *Walter S. Block* of Milwaukee.

For the respondents State Farm Mutual Automobile Insurance Company and Ronald Otto Folkert there was a brief by *Kivett & Kasdorf,* attorneys, and *John R. Henderson* and *F. D. Huber, Jr.,* of counsel, all of Milwaukee, and oral argument by *Mr. Henderson.*

CURRIE, J. The questions which the court deems are presented by this appeal are:

(1) Is there credible medical evidence to sustain the jury's finding of permanent disability?

(2) If such question be answered in the affirmative, are the damages awarded for such permanent disability excessive?

(3) If such damages are excessive, what is the proper option to extend to the plaintiff as an alternative to granting a new trial as to damages?

The accident occurred October 16, 1955. At the time the plaintiff was twenty years of age and was a first-year student at Alverno College in the nurses' training course. Her parents then resided at Harvard, Illinois, and she was then living at the college dormitory. As a result of the collision her left knee was thrown violently against the dashboard of the car in which she was riding.

After the accident she was taken to a hospital. There were four small superficial cuts to the area over her left knee which were cleaned and dressed. She then was discharged and returned to the college dormitory. The next day her left knee was greatly swollen, and it pained and throbbed. However, she managed to attend her classes, and at no time did she miss any classes, except that she was excused from gym classes for a month. Two or three days after the accident she consulted Dr. Meisinger, the college physician, and he prescribed hot compresses. She saw Dr. Meisinger on several occasions after that. She also consulted her family physician at Harvard, Illinois, but he prescribed the same treatment as Dr. Meisinger.

After about six weeks the swelling receded, but the plaintiff testified that as of the time of trial, which was more than three years after the accident, her knee on occasion

would still swell and give her pain. This would occur after she had been on her feet for many hours doing hospital work in connection with her nurse's training. She estimated that such instances of swelling and pain had occurred on an average of two or three times per week ever since the accident. She also testified that there had been occasions when her knee suddenly buckled or gave way.

On October 4, 1957, after the plaintiff had commenced the instant action, she consulted Dr. Verdone. Dr. Verdone made an examination and took X rays. He prescribed a "Thomas heel," which the plaintiff was unable to obtain and cortisone to relieve the pain, but the plaintiff did not take the cortisone. She saw Dr. Verdone four or five times in all.

The only medical witnesses who testified at the trial were Dr. Verdone and Dr. Ansfield, the former being called by the plaintiff and the latter by the defendants.

Dr. Verdone is a physician engaged in general practice. Because of the fact that he had not been consulted by the plaintiff until after she had commenced the action, the trial court refused to permit him to testify to subjective symptoms communicated by the plaintiff. He testified that his diagnosis of the plaintiff's knee condition was that of a tear of the semilunar cartilage. The objective symptom upon which he based this was a clicking which he heard on the flexing of the plaintiff's knee. He stated that damaged cartilages will not regenerate or grow, and will not heal. Comparative measurements taken by him of the plaintiff's calves and thighs disclosed that the left calf was one-half inch smaller in circumference than the right, and the left thigh was five eighths of an inch less in circumference than the right. It was Dr. Verdone's opinion that these differences in measurements were due to atrophy. He defined atrophy as a process of wasting or becoming smaller as a result of not complete

use of an extremity. The X rays taken by the doctor disclosed a normal left knee, but he stated this was because cartilage is not opaque and therefore is not shown on X rays.

Dr. Ansfield is a physician who specializes in orthopedic surgery. On February 6, 1959, he examined the plaintiff on behalf of certain of the defendants. The X rays taken at that time disclosed no bone injury. Measurements taken of the legs disclosed substantially the same slight atrophy in the plaintiff's left leg as did those taken by Dr. Verdone. However, Dr. Ansfield was unable to hear the clicking sound in the left knee upon the plaintiff's flexing the same which Dr. Verdone testified he heard. Dr. Ansfield found no limitation in motion of the knee. He stated that the only way by which it could be determined that there was a torn cartilage would be by performing an exploratory operation, but admitted that there was a possibility of cartilage injury. It was his opinion that there was still some soreness in the knee of a mild character.

Dr. Ansfield further testified it was his opinion that at the time that he examined the plaintiff she had a five per cent disability of the left knee. He was then asked by one of the counsel for the defendants what he took into consideration in estimating such disability and he stated:

"I took into consideration, first of all, her sincerity. I was impressed that she was perfectly honest; that I was ready to accept whatever she said at face value, and that she said that she had some pain and some tenderness off and on; it wasn't constant. On the basis of that, I felt that there was a small amount of disability in the knee."

Dr. Ansfield, in response to a question about the "probability" of surgery being performed on the plaintiff's knee at some future time, gave this answer:

"Well, I would say this: *That I don't believe the knee is going to change.* I don't think it's going to get any worse. I believe that, if it is not going to get any worse, the patient might not want to do anything more about it. However, it's still a matter that rests with her. That's all I can say about that." (Italics supplied.)

The italicized sentence in such answer, coupled with the doctor's estimate of a five per cent disability to the knee existing as of the time of his examination some three years after the accident, is sufficient to permit the jury to draw the reasonable inference that such disability was permanent in character.

In *Diemel v. Weirich* (1953), 264 Wis. 265, 58 N. W. (2d) 651, this court held that, where an injury is subjective in character and of such nature that a layman cannot with reasonable certainty know whether or not there will be future pain and suffering, there must be competent expert opinion testimony bearing on the permanency of such injury, or the likelihood that the injured person will endure future pain and suffering, before recovery may be allowed therefor; and that the unsupported subjective statements of the injured party, not a medical expert, are not sufficient. The symptoms of occasional swelling of the knee and pain, to which the plaintiff testified, are of this latter category. While swelling of the knee is an objective and not a subjective symptom, neither Dr. Verdone nor Dr. Ansfield testified to observing any swelling of the knee. However, the slight atrophy of the left leg, as disclosed by the comparative measurements of the calves and thighs of both legs, constitutes an objective finding. The clicking noise which Dr. Verdone testified he heard when the plaintiff flexed the knee is also objective and not subjective in character.

Furthermore, we do have expert medical testimony that there was some permanent injury. Dr. Verdone gave it as his diagnosis that there was a torn semilunar cartilage,

and he testified that cartilage will not repair. Dr. Ansfield testified that the plaintiff had a five per cent disability of the knee when he examined her in February, 1959, and that he did not believe the knee would change in the future.

The defendants contend that there is no competent medical evidence of permanent injury because both Drs. Verdone and Ansfield were employed after suit was commenced for the purpose of giving testimony rather than treatment. It is pointed out that Dr. Verdone based his opinion partly on subjective symptoms, and Dr. Ansfield's estimate of disability was based entirely on the subjective complaints of the plaintiff.

This court in *Schields v. Fredrick* (1939), 232 Wis. 595, 598, 288 N. W. 241, stated:

"Ordinarily, the opinion of a physician based upon subjective symptoms related to him by the injured person during the course of an examination by him for the purpose of testifying rather than for the purpose of treatment is not admissible in evidence. *Kath v. Wisconsin Central R. Co.* 121 Wis. 503, 99 N. W. 217; 1 Wigmore, Evidence, p. 2250, sec. 1747; 20 Am. Jur., p. 530, sec. 625; 2 Jones, Evidence, p. 2233, sec. 1217; *Maine v. Maryland C. Co.* 172 Wis. 350, 178 N. W. 749; *Stewart v. Everts,* 76 Wis. 35, 44 N. W. 1092; and cases cited in note 21 L. R. A. (N. S.) 826."

The weakness in this contention of the defendants is that the testimony of the two physicians bearing on permanent injury was admitted without objection being made at the time the questions were put. Furthermore, Dr. Ansfield's testimony with respect to the five per cent disability, and the factors upon which he based the same, together with his opinion that there would be no future change in the condition of the knee, was part of his testimony on direct examination when he was being examined by one of defendants' counsel. The rule of the *Schields* and *Kath Cases* is one which is restricted to the admissibility of evidence only. Once opinion

evidence based upon subjective evidence gets into the record without objection it may be considered by the jury in making their findings.

The defendants further maintain that the opinion testimony of the two physicians is insufficient to sustain the jury's finding of permanent injury because elicited by questions which did not call for an opinion based upon a *reasonable degree of medical certainty or probability*. For example, the question put to Dr. Verdone which brought forth the answer of a diagnosis of "torn internal semilunar cartilage" was, "Then what was your diagnosis as to her condition, the condition of that knee, doctor?" Similarly, Dr. Ansfield's statement, "I don't believe the knee is going to change" was not made in response to a question which requested an opinion to a reasonable degree of medical certainty or probability. We recently dealt with this same problem in *Unruh v. Industrial Comm.* (1959), 8 Wis. (2d) 394, 402, 99 N. W. (2d) 182. It was therein held that conclusions of a medical expert witness should amount to an assertion of his professional opinion, and that an opinion expressed in terms of "I feel" or "I believe" is sufficient. Of course an expert opinion expressed in terms of a mere possibility is insufficient to sustain a finding. *Michalski v. Wagner* (1960), 9 Wis. (2d) 22, 100 N. W. (2d) 354.

It is our considered judgment that there was sufficient competent medical testimony to support the jury's finding that the plaintiff did sustain a permanent injury to her left knee as a result of the accident. Therefore, it was error for the trial court to have changed the answer in the verdict which so found.

We turn now to the question of whether the $5,000 awarded for permanent injury is excessive. We have already recounted all of the pertinent evidence bearing upon permanent disability except that relating to a possible opera-

tion to remove the torn cartilage which Dr. Verdone testified is present in the plaintiff's left knee.

Dr. Ansfield testified that athletes frequently sustain torn cartilage of the knee and undergo operations for the same. He further stated that after such operations these athletes are usually able to resume their athletic activities. It was his further testimony that in a majority of cases patients who undergo such an operation have a good, normally functioning knee afterward. There was further evidence that such an operation would cost $200 and that the patient would require two weeks of hospitalization at an approximate cost of $364. In addition to medical and hospital costs, such operation would entail some pain and suffering and some loss of earnings.

There is no legal requirement that the plaintiff undergo such an operation in order to minimize her damages. The only purpose in reviewing this evidence relating to a possible operation is to consider whether it would sustain the $5,000 award if the plaintiff should elect to undergo such operation. We are satisfied it would not.

It is our considered judgment that the award of $5,000 for permanent injury is excessive in that the evidence will not support the same. Heretofore, it has been customary in such a situation to fix the lowest amount that an unprejudiced jury properly instructed might award for damages, and then to grant the plaintiff the option of accepting such amount or having a new trial. However, in his dissenting opinion in *Genrich v. Schrank* (1959), 6 Wis. (2d) 87, 93 N. W. (2d) 876, Mr. Justice FAIRCHILD advanced another alternative for dealing with excessive verdicts which are not the result of perversity or error committed during the course of trial. We quote from such dissenting opinion as follows (p. 94) :

"But where there has been no error or perversity, there would be no injustice to defendant in giving plaintiff an option of a new trial or judgment for an amount fixed by the court as a fair and reasonable award under the evidence. Such a rule would give greater protection to the plaintiff. While he could still choose a new trial, his alternative would be more liberal to him than under the present rule. It would sufficiently protect the defendant from the excessive award.

. . .

"It is undoubtedly in the public interest to avoid unnecessary second trials and to seek an earlier determination of the litigation at a figure which is within the range of fairness. There is no reason, where the range is wide, for requiring the court to fix a low figure when the jury has already indicated that it thinks that the plaintiff deserves the highest figure the evidence will sustain."

During the fifteen months which have elapsed since *Gennrich v. Schrank, supra,* was decided, the members of this court have had an opportunity to discuss the alternative proposed in such dissenting opinion with lawyers and trial judges. The impression gained from these informal discussions is that most lawyers and trial judges would approve of this court's adopting such alternative. We are firmly of the opinion that if the plaintiff were granted the option of accepting a reasonable amount as determined by the trial or appellate court, instead of the least amount that an unprejudiced jury properly instructed might award, the number of instances in which the plaintiff would be likely to refuse such option and elect a new trial would be greatly reduced. Furthermore, such alternative is one which appeals to our sense of justice, and is widely used in other jurisdictions.

However, there is one further facet of the problem that must be resolved in arriving at a determination of whether this court should now adopt such alternative, and that is the constitutional issue. Sec. 5, art. I of the Wisconsin constitution, makes a trial by jury mandatory in "all cases at

law without regard to the amount in controversy." The right to trial by jury preserved by this provision of our constitution is the right as it existed at the time of the adoption of the constitution in 1848. *Campbell v. Sutliff* (1927), 193 Wis. 370, 214 N. W. 374, 53 A. L. R. 771. The power of courts to set aside excessive verdicts and to grant new trials was firmly established even before the adoption of the United States constitution. Ibid. In the early case of *Corcoran v. Harran* (1882), 55 Wis. 120, 127, 12 N. W. 468, the court declared:

"We must therefore hold that, in actions of tort as well as contract, where the damages are clearly excessive, the trial judge may either grant a new trial absolutely, or give the plaintiff the option to remit the excess, and in case he does so order the verdict to stand for the residue. Certainly the practice will tend to promote justice and lessen the expense to litigants and the public. Besides, the allowance of such option is no more of an exercise of arbitrary power by the trial judge than it would be for him to set aside the verdict absolutely upon the sole ground that it is excessive, and then, in effect, direct a jury to bring in a verdict for a smaller sum, but not in excess of an amount named by the court."

We interpret such quoted statement as not requiring that the amount of the judgment to be remitted by the plaintiff to be reduced to the least amount for which a verdict might be rendered by the jury and be permitted to stand by the court. Some of the cases from other jurisdictions cited by the court in its opinion in support of such declared rule lend credence to this interpretation.

The case of *Corcoran v. Harran, supra,* was followed by that of *Baker v. Madison* (1885), 62 Wis. 137, 22 N. W. 141, which was an action to recover for personal injuries resulting from a defective condition of a street. The jury awarded $6,000 damages which the supreme court held to be

excessive, and the plaintiff was granted the option of remitting $2,500 of the judgment or having a new trial. The sum of $3,500, which under such mandate the plaintiff had the right to retain as damages, clearly was not the lowest amount that a jury might properly allow. This is established by the fact that the case had gone through two prior trials in which the juries had fixed the damages at $2,500 and $3,000.

However, without expressly overruling the sensible rule laid down by the *Corcoran v. Harran* and *Baker v. Madison Cases,* the court did abandon the same in the later cases of *Heimlich v. Tabor* (1905), 123 Wis. 565, 102 N. W. 10, and *Campbell v. Sutliff, supra.* In such later cases it was in effect held that, in cases involving unliquidated damages, the granting to the plaintiff of the option, to accept any amount of damages less than the lowest amount for which the court would permit a verdict to stand, would violate the defendant's right to a jury trial. The rule of the *Heimlich Case* has continued to be the acknowledged law of this state ever since it was announced in 1905.

In most jurisdictions in this country, when the jury has returned a verdict which the trial or appellate court deems excessive, but not caused by passion or prejudice, the courts follow the practice of allowing the plaintiff the option of avoiding a new trial by remission of the excess above an amount which the court considers reasonable. Correction of Damage Verdicts by Remittitur and Additur, 44 Yale Law Journal (1934), 318; Remittiturs and Additurs, 49 West Virginia Law Quarterly (1942), 1; and annotations in 53 A. L. R. 779, and 95 A. L. R. 1163. This is also the practice followed in the federal courts. See *Fornwalt v. Reading Co.* (D. C. Pa. 1948), 79 Fed. Supp. 921, wherein the court determined that $7,500 was the "fair amount" of plaintiff's

damages for personal injuries and granted the plaintiff the option of remitting the excess.

The United States supreme court in a unanimous opinion by the first Mr. Justice HARLAN held in *Arkansas Valley Land & Cattle Co. v. Mann* (1889), 130 U. S. 69, 9 Sup. Ct. 458, 32 L. Ed. 854, that such practice of granting the plaintiff the option to remit the excess amount by which a verdict is determined by the court to be excessive does not violate the right to trial by jury guaranteed by the Seventh amendment of the United States constitution. A number of the state courts have directly passed upon the constitutional issue and have upheld the rule of basing the amount to be remitted upon the excess over and above a reasonable amount. Among the cases so holding are: *Sewell v. Sewell* (1926), 91 Fla. 982, 109 So. 98; *Burdict v. Missouri Pacific R. Co.* (1894), 123 Mo. 221, 27 S. W. 453; and *Alter v. Shearwood* (1926), 114 Ohio St. 560, 151 N. E. 667.

As previously mentioned herein, it was acknowledged that courts had the power to set aside excessive verdicts and grant new trials long before either the federal or state constitutions were adopted. If a court has the power to hold a verdict for a certain amount excessive, it necessarily follows that it has the power to determine an amount which is not excessive. As the Missouri court well stated in *Burdict v. Missouri Pacific R. Co., supra* (p. 242), "If it possesses the power to say the one thing, it possesses the power to say the other." Therefore, when a court determines that a certain amount is a reasonable amount to allow for plaintiff's unliquidated damages, it is the equivalent of holding that such amount is not excessive.

. It is our considered judgment that we should adopt the rule that where an excessive verdict is not due to perversity

or prejudice, and is not the result of error occurring during the course of trial, the plaintiff should be granted the option of remitting the excess over and above such sum as the court shall determine is the reasonable amount of plaintiff's damages, or of having a new trial on the issue of damages. In so doing we are reverting to the early rule of *Corcoran v. Harran, supra,* and *Baker v. Madison, supra.* This necessitates overruling *Heimlich v. Tabor, supra,* and *Campbell v. Sutliff, supra,* in so far as they hold that such a rule violates the defendant's constitutional right to a trial by jury.

Based upon a careful review of all of the pertinent evidence bearing upon permanent disability, we determine that $3,000 is a reasonable sum to award to the plaintiff for permanent disability. Therefore, the plaintiff should be accorded the option of accepting judgment for such sum, together with the sum of $1,500 awarded for pain and suffering, or a total of $4,500, or of having a new trial confined to the issue of damages.

*By the Court.*—The judgment is modified by increasing the amount of plaintiff's damages from $1,500 to $4,500, exclusive of costs, unless within twenty days from April 5, 1960, the plaintiff shall file with the clerk of this court a notice in writing that she elects to have a new trial limited to the issue of damages only. If such notice electing such new trial is timely filed, the judgment will be reversed, and the cause remanded for further proceedings not inconsistent with this opinion.