UPPER LAKES SHIPPING, LTD., Plaintiff and Respondent, v. SEAFARERS' INTERNATIONAL UNION and others, Defendants : PEARL, Appellant.

*March 30—April 28, 1964.*

498

500

For the appellant there was a brief by *Jeknavorian, Ludwig & Shlimovitz* of Milwaukee, and oral argument by *Garbis C. Jeknavorian.*

For the respondent there was a brief by *Foley, Sammond & Lardner,* attorneys, and *Herbert P. Wiedemann* and *Eugene C. Daly* of counsel, all of Milwaukee, and oral argument by *Mr. Daly.*

WILKIE, J. The first of five issues raised on this appeal is as follows:

1. *On the circumstances of this case, should Pearl have been prosecuted for criminal contempt pursuant to the provisions of ch. 256, Stats., rather than civil contempt pursuant to the provisions of ch. 295, Stats.?*

For the first time in these proceedings Pearl contended on oral argument here that his alleged contumacious conduct, if established, should have been tried under the criminal contempt procedures prescribed by sec. 256.07, Stats., rather than the civil contempt procedures prescribed by ch. 295, Stats.

With the commencement of this matter on April 22, 1963, and throughout the proceedings in the Pearl I matter, all parties have assumed that Pearl's alleged conduct was a matter of civil contempt. All parties have relied upon this assumption in the conduct of the litigation. Therefore, it is the law of this case that the civil contempt provisions of ch. 295, Stats., are the proper guides for the disposition of this controversy.

2. *In a prosecution for civil contempt, does the contemnor have a constitutional right to trial by jury pursuant to the due-process requirements of the Fourteenth amendment of the United States constitution and/or sec. 5, art. I of the Wisconsin constitution?*

Fourteenth amendment due process does not require that a contemnor in a civil contempt proceeding in a state court be tried by a jury.[3]

Moreover, a contemnor, tried for civil or criminal contempt in a federal court proceeding has no constitutional right to jury fact-finding.[4] *A fortiori,* a contemnor tried for civil contempt alone in a state court has no federal constitutional right to trial by jury.

Nor is a contemnor in a civil contempt proceeding entitled to a jury trial pursuant to the provisions of sec. 5, art. I, Wisconsin constitution.[5]

---

[3] *Eilenbecker v. Plymouth County* (1890), 134 U. S. 31, 10 Sup. Ct. 424, 33 L. Ed. 801.

[4] *Green v. United States* (1958), 356 U. S. 165, 78 Sup. Ct. 632, 2 L. Ed. (2d) 672. *United States v. Barnett* (1964), 376 U. S. 681, 84 Sup. Ct. 984, 12 L. Ed. (2d) 23 (decided April 6, 1964). No jury trial in criminal contempt proceedings when it is likely that the court will impose a sentence no greater than that imposed for "petty offenses."

[5] "TRIAL BY JURY; VERDICT IN CIVIL CASES. *Section 5.* [*As amended Nov. 1922*] The right of trial by jury shall remain inviolate, and shall extend to all cases at law without regard to the amount in controversy; but a jury trial may be waived by the parties in all cases in the manner prescribed by law. Provided,

As to the scope of the state constitutional right to jury trial, we have stated:

"The right to trial by jury preserved by this [sec. 5, art. I] provision of our constitution is the right as it existed at the time of the adoption of the constitution in 1848." [6]

The scope of this provision is further limited to actions "at law" at the time of the adoption of the original constitution.

Historically, injunctive proceedings have been deemed actions in equity, and must still be regarded as such for the purpose of determining the scope of sec. 5, art. I, notwithstanding the statutory merger of law and equity.[7] Moreover, proceedings arising out of attempts to obtain injunctive relief are also equitable actions for the purpose of determining the state constitutional right to trial by jury.[8] Therefore, contempt proceedings arising out of alleged violations of an injunction are for the purposes of sec. 5, art. I, equitable actions, rather than actions at law, and the alleged contemnor has no constitutional right to trial by jury.

There is no statutory right to a trial by jury in a contempt proceeding where an injunction has been issued as in this matter. Since the conflict between Upper Lakes and Seafarers' International Union of Canada was not deemed a "labor dispute" within the meaning of sec. 103.62 (3),

---

however, that the legislature may, from time to time, by statute provide that a valid verdict, in civil cases, may be based on the votes of a specified number of the jury, not less than five-sixths thereof."

[6] *Powers v. Allstate Ins. Co.* (1960), 10 Wis. (2d) 78, 89, 102 N. W. (2d) 393; *Burke v. Madison* (1962), 17 Wis. (2d) 623, 635, 117 N. W. (2d) 580.

[7] *State v. Ross* (1951), 259 Wis. 379, 48 N. W. (2d) 460.

[8] *State v. Ross, supra.* See also *John F. Jelke Co. v. Beck* (1932), 208 Wis. 650, 242 N. W. 576, wherein court recognized that injunctive relief sought in labor disputes historically regarded as "equitable" proceedings.

Stats.,[9] the jury trial provisions of sec. 103.60 are not applicable.

3. *Does the failure of Upper Lakes to file an affidavit prior to the contempt hearing, supporting the allegations of contempt in relation to Pearl's conduct on April 22d, constitute procedural error justifying a new trial on that event, and further, does the failure of Upper Lakes to file interrogatories (although there was an affidavit filed), in relation to the alleged contempts on May 11th, 12th, and 30th, constitute procedural error justifying a new trial on these events?*

In Pearl I, this court held that the private party seeking to protect his legal and economic position by means of civil contempt proceedings must, pursuant to the provisions of sec. 295.04, Stats., file an affidavit outlining the basis of the contempt charge prior to the commencement of the contempt hearing. In addition to the filing of such affidavit, the moving party must supply the contemnor with interrogatories "specifying the facts and circumstances alleged against the defendant and requiring his answers thereto." [10] Failure to comply with these provisions will prevent the trial court from entering valid findings of contempt.[11]

Although sec. 295.12, Stats.,[12] does not literally require interrogatories where the alleged contemnor is brought before the court not by attachment but on an order to show cause, we note that the attachment and the order to show cause serve the same function, *i.e.*, to bring the contemnor before the court. It is not reasonable that the right to dis-

---

[9] *Upper Lakes Shipping v. Seafarers' I. Union* (1963), 18 Wis. (2d) 646, 119 N. W. (2d) 426.

[10] Sec. 295.12, Stats.

[11] *Upper Lakes Shipping v. Seafarers' I. Union* (1963), 22 Wis. (2d) 7, 18, 125 N. W. (2d) 324.

[12] "295.12 INTERROGATORIES, FILING OF, AND PROCEEDINGS. When any defendant shall have been brought into court by virtue of an attachment, or on such writ of habeas corpus, or shall have appeared upon the return of an attachment the court shall, unless he admits

covery should turn on the label attached to functionally similar moving papers, and we conclude that the provisions of sec. 295.12 require interrogatories in both instances.

In the instant appeal, Upper Lakes filed no affidavit in relation to Pearl's personal picketing activities on April 22d, nor did Upper Lakes provide any interrogatories in relation to this event. Although Upper Lakes did file an affidavit setting forth the basis of its claim of civil contempt in relation to the picketing activities in May, it filed no interrogatories in relation to this matter.

Pearl argues that the failure to file these documents deprived the trial court of jurisdiction to proceed to judgment. Upper Lakes argues that in fact Pearl was well aware of the nature of the charges against him at the time of hearing, and therefore the purpose of secs. 295.04 and 295.12, Stats., was satisfied.

In evaluating these claims, we must first distinguish the function of sec. 295.04 from the purpose of sec. 295.12, Stats. The affidavit provision informs the alleged contemnor of the general nature of the charge against him. The affidavit is the equivalent of the complaint in the normal civil action. On the other hand, the interrogatory provision gives the contemnor detailed discovery of the moving parties' theory and main lines of evidence. The interrogatories are the equivalent of the discovery provisions of sec. 326.12 applicable in the normal civil action. The purpose of sec. 295.12 is not simply to inform the contemnor of the nature of the charge—this is accomplished by the affidavit—but rather to

the offense charged, cause interrogatories to be filed specifying the facts and circumstances alleged against the defendant and requiring his answers thereto; to which the defendant shall make written answers on oath within such reasonable time as the court shall allow; and the court may receive any affidavits or other proofs, contradictory of the answers of the defendant or in confirmation thereof, and upon the original affidavits, such answers and such subsequent proof shall determine whether the defendant has been guilty of the misconduct alleged."

give him the discovery that all other civil defendants enjoy. Therefore, even if the defendant is fully apprised of the nature of the charge, denial of discovery is prejudicial *per se,* given the obvious aid in preparation which the interrogatories provide.

This construction of secs. 295.04 and 295.12, Stats., is consistent with the theory of civil contempt proceedings as a means of protecting the position of a private litigant. It places the moving party in no more favorable and no less favorable procedural position than any other civil litigant seeking to utilize the judicial process as a means of protecting his private interests.

Upper Lakes had the duty to file an affidavit and interrogatories in relation to the April 22d picketing and an additional duty to file interrogatories in relation to the May picketing.

However, it is clear that in the instant case, Pearl waived his right to the affidavit and both sets of interrogatories.

Pearl was brought before the circuit court on April 22d. A hearing upon the alleged contempt was set for May 2d. This matter was ultimately postponed until June 20th. In the interim, Pearl filed an affidavit of prejudice against Judge CURLEY, who was to conduct the hearing. At any time during this period of nearly two months, Pearl could have made a demand for the affidavit and interrogatories. The failure to do so is an intentional affirmative waiver of his rights under the relevant statutes.

In relation to the May activities, Upper Lakes filed an order to show cause supported by an affidavit on June 14th. The hearing was held on June 20th. Pearl could have filed a motion asking the court to direct Upper Lakes to provide interrogatories at any time prior to hearing and could have obtained postponement of such hearing in order to accomplish this objective. His willingness to go to trial on June 20th was

a waiver of his procedural rights. A party cannot willingly proceed to judgment after a hearing and then, after the fact, claim that he was not given an opportunity to properly prepare his defense.

4. *On the circumstances of this case, is there credible evidence on the record as a whole to support a finding that Pearl, as an individual, picketed Upper Lakes' ships in April of 1963, and that he organized and aided picketing activities against Upper Lakes in May of 1963, and finally that his entire course of conduct in both April and May was undertaken in active concert with SIU of Canada?*

The evidence must be considered in relation to the following propositions: (1) That on April 22d, Pearl as an individual picketed the S. S. James Norris, an Upper Lakes' ship, and that Pearl aided and abetted the picketing activities of others in May; (2) that Pearl's conduct was calculated to, and in fact did, impair certain Upper Lakes' interests; (3) that Pearl's course of conduct in April and May was carried out in active concert with the named parties in the June, 1962, injunction.

(1) That Pearl individually picketed the Norris for about a half an hour with the protesting sign described above is established by the uncontroverted testimony of a police officer who encountered him on a roadway leading to a grain elevator, adjacent to which the Norris was moored.

On May 11th, two pickets circled the Norris in an outboard boat raising a similar picket sign (also described above).

On May 12th, one of these pickets, Fred Roddy, was encountered in an automobile in the dock area. Edward Allred, who from the roadway and on foot had been picketing the Norris, moored in the harbor at this time, came to the car and joined Roddy and another person. We have already referred to the fact that the officers found in the trunk of

the car both union material addressed to Pearl and additional picket signs. Most significantly, the car had been rented to Pearl from the Hertz Rent-a-Car service. The evidence permits the inference that the active picket was transported to the dock area in the car rented by Pearl, and that this fact in turn is evidence that Pearl aided and abetted the activities on May 12th. Because Roddy was involved in events of May 12th and May 11th, and in light of the similarity in conduct on these two days, the fact that Pearl aided the pickets on May 12th permits the inference that he aided Roddy in the picketing activities of May 11th. This inference is in turn supported by the events of May 30th. On that day, some six to eight small boats picketed the Red Wing. The evidence revealed that on May 29th, Pearl rented several outboard motorboats. At least one of these boats was involved in the May 30th picketing. Given the similarity in picketing technique, the fact that Pearl clearly aided and abetted the activities on Memorial Day permits the inference that he aided and abetted similar picketing on May 11th.

(2) Clifton Mantey, the union steward for the Brewery Workers local, whose members loaded Continental grain onto Upper Lakes' ships testified that the members of his union consistently refused to load the grain in the face of the picketing activities. He testified that on April 22d, he directly observed Pearl picketing, conveyed this information to his membership, and thereafter the workers refused to load the ship until the picketing halted. Pearl was an experienced labor official of MEBA. The trial court could reasonably infer that he knew that picketing in this context was not only as a means of advertising the existence of a labor dispute, but was also a form of economic pressure. Pearl could reasonably predict that the Brewery Workers would respond to his activity by refusing to load the ship. Therefore the court could conclude that the April 22d picket-

ing was calculated to impair Upper Lakes' economic interests.

Because of the success of the picketing activities in April, the court could conclude that the picketing in May was designed to bring about the same objective—the Brewery Workers' refusal to handle "hot cargo" going to the Upper Lakes' ship.

The picketing in April and May did in fact injure Upper Lakes' economic position. As noted, Mantey testified that the Brewery Workers refrained from loading the ships on each occasion that the pickets appeared. Specifically, he testified that the loading operation of the Norris was delayed about two hours because of the picketing on April 22d. He further specifically testified that the loading of the Red Wing was delayed on Memorial Day because of the presence of the picket boats.

Thomas Houtman, personnel manager for Upper Lakes, testified that a ship such as the Norris had to earn $4,500 a day in order to profitably meet "overhead" costs. He testified that it cost Upper Lakes $180 an hour to have the Norris stand idle, and that this lost "production" could not be recovered by operating the ship at overtime. Because the "production schedule" of a ship is dependent upon persons, other than employees of the company, the company cannot unilaterally accelerate "production" to make up for lost time. Lost time is gone forever.

On April 22d, the loading of the Norris involved at least two hours overtime for the employees of the elevator, costs passed on to Upper Lakes. David Clausing, steamship agent for Upper Lakes, testified that the elevator charges $110 per hour for overtime work. On April 22d four weighers were used during the overtime operations. Their overtime rate is $2.10 per hour. A sampler and inspector were utilized at overtime rates of $3.15 and $4.00 per hour respectively.

Considering the production loss and the overtime expenditures, the trial court could reasonably conclude that Upper Lakes sustained a loss of approximately $600 as a result of the picketing activities of April 22d alone. Because the evidence revealed that on all occasions in May work on the ship was idled when the pickets appeared, the court could conclude that Upper Lakes in fact sustained at least production losses as a result of the activities of May 11th, 12th, and 30th.

(3) To demonstrate that Pearl's course of conduct was undertaken in "active concert" with SIU of Canada, the company had to prove the fact of an agreement between Pearl and SIU of Canada to jointly undertake a course of action designed to impose economic pressure on Upper Lakes.

The trial court could reasonably conclude that Pearl, as a member of MEBA, entered into an agreement with the leadership of SIU of Canada, whereby he would organize and aid picketing activities designed to place economic pressure on Upper Lakes in their conflict with SIU of Canada, and that the activities of April and May were in execution of that agreement.

Thomas Houtman, Upper Lakes' personnel manager, testified that MEBA and SIU of Canada had pursued joint organizational efforts in the Canadian maritime industry. SIU of Canada would attempt to organize a particular class of maritime employees within SIU. Failing in this effort, MEBA would attempt to organize the same employees. Both unions used the same persons as organizers in these efforts.

Captain Young, an Upper Lakes employee, testified in relation to certain picketing activities directed against Upper Lakes' ships in Toledo in May, 1962.

He testified that a picket carrying a SIU sign would appear in the dock area. The company had obtained an injunction similar to the relief present in the instant case. The police removed the picket. He later returned carrying an

MEBA sign. The man was identified as Harvey McKinnon a port agent or business agent for both MEBA and SIU of Canada. Therefore, the trial court could reasonably conclude that MEBA and SIU of Canada not only pursued joint policy in labor matters generally, but had come to an agreement to work together in SIU's fight with Upper Lakes.

This conclusion is reinforced by specific evidence surrounding the activities in Milwaukee in April and May, 1963. When Pearl rented the Hertz car utilized to transport a picket on May 12th, he gave SIU of Canada as his company identification.

Therefore, the evidence of joint policy between MEBA and SIU of Canada in relation to SIU's dispute with Upper Lakes across the entire Great Lakes area, and the evidence that Pearl, as an executive of MEBA (Pearl is the international staff representative of MEBA for the Milwaukee area), acknowledged on one occasion that he was working for SIU of Canada, is sufficient to sustain the finding of active concert.

5. *Was the sentence of the court consistent with the provisions of secs. 295.14 and 295.15, Stats?*

The court ordered Pearl to indemnify Upper Lakes in the amount of $881.75; $250 of this amount to be applied toward attorneys' fees, and $50 to be applied to disbursements. The remaining $581.75 was compensation for the loss resulting from the picketing activities of April 22d. By the terms of the court's order Pearl would be incarcerated if and only if he failed to pay this sum. Therefore, his incarceration, if any, would not be a direct result of his *completed* course of contumacious conduct which could not be undone by any affirmative act, but would be a result of his *present* failure to indemnify Upper Lakes for a demonstrated loss. Such sentence is within the powers conferred by secs. 295.14 and 295.15.

*By the Court.*—Judgment affirmed.